HERBERT B. MOSKOVITZ and MARY MOSKOVITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MARY SALOMONE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moskovitz v. Commissioner
Docket Nos. 31406-81, 31407-81.
United States Tax Court
T.C. Memo 1986-357; 1986 Tax Ct. Memo LEXIS 255; 52 T.C.M. (CCH) 98; T.C.M. (RIA) 86357; August 6, 1986. Phyllis Horn and J. Earl Epstein, for the petitioners. Lynn L. Casimir, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax under section 6653(a)[1] as follows: Additions to tax
Docket No.
Year
Deficiency
under sec. 6653(a)
31407-81
1973
$7,738
$387.00
31406-81
1974
8,251
412.56
1975
6,871
344.00
The issues for decision *257 are: (1) Whether respondent's determination of omitted gross income in the amounts of $21,501, $23,060 and $20,288 for the taxable years 1973, 1974, and 1975, respectively, is correct; (2) Whether respondent is barred by the normal 3-year statute of limitations from assessing and collecting the deficiencies in income tax due or the additions to tax for the taxable years 1973, 1974, or 1975; (3) Whether petitioner Mr. Moskovitz is an innocent spouse within the meaning of section 6013(e); and (4) Whether any part of petitioner Mary Salomone's underpayment of income tax liability for 1973, and petitioners' underpayment of income tax liabilities for 1974 and 1975 was due to negligence or intentional disregard of rules and regulations. Petitioners, Herbert Moskovitz (hereinafter "Mr. Moskovitz") and Mary Moskovitz (hereinafter "petitioner") were married on November 30, 1974. Petitioner-wife's maiden name was Salomone. At the time they filed the petitions in these cases, petitioners were residents of Cornwells Heights, Pennsylvania. Petitioner filed a timely income tax return for her 1973 taxable year. Petitioners filed timely joint Federal income tax returns for their 1974 *258 and 1975 taxable years. On December 3, 1981, respondent mailed a notice of deficiency to petitioner for her 1973 taxable year showing the deficiency and additions to tax set forth above. On the same date, respondent mailed a notice of deficiency to petitioners for their 1974 and 1975 taxable years showing the deficiencies and additions to tax noted above.The amount of gross income reported on petitioner's 1973 return is $11,175.81. The amount of gross income stated on petitioners' 1974 and 1975 joint Federal income tax returns is $20,608 and $21,004, respectively. On September 15, 1979, and June 15, 1980, petitioner executed Forms 872 consenting to extensions of the statute of limitations with regard to her 1973 return to December 31, 1980, and December 31, 1981, respectively. In each instance, her consent was expressly conditioned on the applicability of the 6-year statute under section 6501(e)(1). On June 15, 1980, petitioners executed a Form 872 consenting to a similar extension with regard to their 1974 joint return to December 31, 1981. This consent was also expressly conditioned on the applicability of section 6501(e)(1). On March 12, 1979, September 15, 1979, and June 15, 1980, petitioners *259 executed Forms 872 consenting to extensions with regard to their 1975 joint return to December 31, 1979, December 31, 1980, and December 31, 1981, respectively. The consents regarding the 1975 return, however, were not made expressly conditional on the applicability of section 6501(e)(1). From January 1971 through July 1975, petitioner was employed by Mr. Robert P. Levy and DRT Industries, Inc. (hereafter "DRT") of Philadelphia, Pennsylvania as Mr. Levy's personal secretary and bookkeeper. Pursuant to this employment, Mr. Levy gave petitioner a power of attorney with respect to a checking account of his, hereafter referred to as "the special account." Petitioner left her employment with Mr. Levy and DRT, at the end of July 1975, because she was pregnant. Janet Szlachta, another of Mr. Levy's employees, took over the duty of maintaining the special account on August 1, 1975. She noticed some irregularities in the records of that account and determined that it would not balance. Mr. Levy advised Ms. Szlachta to contact his accountant, Mr. Martin Goldberg, for assistance in reconciling the special account. Mr. Goldberg's initial audit of the special account took place in August *260 1975. He reviewed the transactions in that account for the 4 months preceding petitioner's leaving Mr. Levy's employ and prepared a list of discrepancies found in the account's records for that period. The discrepancies consisted of unrecorded deposits and cleared and returned checks not in agreement with the notations on the corresponding check stubs from which they had been detached. For the period of June 13, 1975 through July 17, 1975 (the latter being the cutoff date for the last bank statement issued prior to petitioner's departure), Mr. Goldberg found the following discrepancies: (a) 3 unrecorded deposits totaling $6,727. (b) check no. 513: stub read $15, check cleared for $1,500 to cash. (c) check No. 520: stub read "void," check cleared for $200. (d) check No. 547: stub read $15, check cleared for $1,500 to cash. (e) check No. 567: stub read $100 to cash, check cleared for $1,000 to cash. Using the corrected balance at the beginning of this period (i.e., the balance as of June 13, 1975) shown by the bank on its statements and using the figures recorded by petitioner on the stubs of checks drawn during this period, Mr. Goldberg arrived at a closing balance for *261 the period of $1,982. As of July 17, 1975, the bank statement showed a balance which, when adjusted for the outstanding checks and deposits in transit, came to $675. By taking into account the discrepancies found for the period, and using the corrected balance for the beginning of the period, Mr. Goldberg arrived at a closing balance of $675 as well. Petitioner herself had written $675 as the balance in the account on the stub for check number 593 which is dated July 31, 1975. Petitioner testified that she relied upon the bank statements rather than the check stubs to balance the account and that for this reason she often did not fill in the check stubs. The June-July bank statement however, was unopened when Janet Szlachta found it. Mr. Goldberg looked for discrepancies in the other accounts handled by petitioner for Mr. Levy but he found none.Ms. Szlachta prepared the list of checks which form the basis for the deficiencies determined by respondent. Petitioner prepared monthly bank reconciliations by listing checks in numerical order. She also reconciled the balance shown on the most recent bank statement received with the balance purportedly indicated on the checkbook *262 stubs by adding deposits in transit and subtracting outstanding checks. Mr. Levy occasionally asked petitioner to make purchases on his behalf, after which he would reimburse her by a check drawn on the special account, either directly or by paying the bill from the vendor. Petitioner would draw such checks for reimbursement herself. When making purchases on Mr. Levy's behalf, petitioner sometimes used her own charge accounts with a particular store or with her bank. Mr. Levy approved this procedure because it was sometimes easier for petitioner to make purchases in this way rather than to use a check from the special account, which had Mr. Levy's name on it, or to use one of Mr. Levy's own charge accounts. At the end of each month, petitioner paid Mr. Levy's bills. As bills came into Mr. Levy's office, she put them in a file that she kept for that purpose. When it came time to pay the bills, petitioner added the bills in the file to those that had been sent to Mr. Levy's home over the same 4-week period. She would then submit the bills to Mr. Levy who would check the bills, and have petitioner make out a check drawn on another account for an amount sufficient, once deposited *263 into the special account, to pay the bills. In addition, Mr. Levy would tell petitioner to deposit enough money into the special account to allow occasional checks to be drawn payable to "cash" during the next month. Mr. Levy would determine the amount of the check on the basis of the prior balance in the special account. He learned the prior balance simply by asking petitioner what it was. Mr. Levy would sign the check, and petitioner would deposit it into the special account. If Mr. Levy had asked petitioner to make any purchases on his behalf during the month, she would put the bills for these purchases in the file she kept for bills that were sent to Mr. Levy's office, and submit them to Mr. Levy at the end of the month as described above. The understatement of $21,501.02 determined by respondent for the 1973 taxable year in petitioner's income was based on the sum of 90 different checks drawn on the special account during 1973. The understatement for 1974 consisted of respondent's inclusion in petitioners' taxable income for that year of $23,060, which was not reported on their return. This amount reflects the sum of 110 checks drawn on the same account during the 1974 *264 taxable year. The understatement for 1975 is based on respondent's inclusion in petitioners' taxable income for that year of $20,288, which was not reported on their return. This amount consists of the sum of 57 checks drawn on the same account during the 1975 taxable year. All 257 of the checks referred to above were completed and signed by petitioner. [2]
What follows is a description of the circumstances surrounding the various checks that were included in the understatements during the years in issue. In April of 1973, petitioner bought a baby set at the John Wanamaker store in Philadelphia (hereafter "Wanamaker's") for $32 which was charged to her own account at the store. The balance due on her charge account at *265 the end of April 1973, which reflected various charges including the one for this baby set, was $60.50. In May 1973, a check for $60.50, number 10989, was drawn on the special account payable to Wanamaker's. The corresponding checkbook stub was properly completed by petitioner. In June of 1973, petitioner bought two games and two swimsuits at Wanamaker's. The cost of these items, $59.36 combined, was charged to her own account at the store. The balance due on petitioner's charge account at the end of June 1973, which reflected various charges including the ones noted above, was $126.99. In July 1973, a check for $126.99, number 11140, was drawn on the special account payable to Wanamaker's. The stub corresponding to this check was properly completed by petitioner. In August 1973, petitioner bought a record (or some records) at Wanamaker's. She made this purchase by placing a charge for the cost ($2.86) on her own account at the store. The balance due on petitioner's Wanamaker charge account at the end of August 1973, which reflected various charges including the one for the record or records, was $45.86. In September 1973, a check for $45.86, number 11262, was drawn on *266 the special account payable to Wanamaker's. The stub corresponding to this check was properly completed by petitioner. In January 1974, petitioner bought a backgammon game and two puzzles at Wanamaker's. The cost of these items ($16.94) was charged to petitioner's own account at the store. The balance due on petitioner's charge account at the end of January 1974, which reflected various charges including the one for these items was $41.94. In February 1974, a check for $41.94, number 11581, was drawn on the special account payable to Wanamaker's. The stub corresponding to this check was properly completed by petitioner. Mr. Levy gave petitioner some gifts during the time she was in his employ, including an engagement present and a wedding present. In April 1974, and in June of that year, she bought crystal (36 pieces in all) at Wanamaker's for $311.64 and $114.48, respectively. These amounts were charged to petitioner's own account at the store. The balance due on her Wanamaker's account at the end of April 1974 was $335.14; at the end of June 1974 the balance due was $351.35. In May 1974, a check for $335.14, number 11800, was drawn on the special account payable to Wanamaker's, *267 and in July 1974, a check for $351.35, number 11936, was drawn on the special account payable to the same store. The stubs corresponding to these checks were properly completed by petitioner. The total amount of all payments made on petitioner's charge account at Wanamaker's in 1973 is $852.15. This entire amount was paid by checks drawn by petitioner on the special account. These checks from part of the basis for the 1973 deficiency determined by respondent. The total of all payments made on petitioner's Wanamaker's charge account in 1974 is $1,794.68. Of this amount, $1,781.68 (all but $13) was paid by checks drawn by petitioner on the special account which form part of the basis for the 1974 deficiency. The total of all payments made on her charge account at Wanamaker's between January 1 and August 1, 1975 is $782.35. This entire amount was paid by checks drawn on the special account which form part of the basis for the 1975 deficiency. [3]
*268 The following checks were drawn on the special account payable to a catalog company called The Horchow Collection: Number
Date
Amount
11811
5/13/74
$99.60
11884
6/11/74
20.95
12101
9/13/74
110.80
12114
9/20/74
75.50
12119
9/27/74
241.70
The stubs that correspond to these checks were all properly completed by petitioner. In January of 1975, and in June of that year, she ordered additional items from The Horchow Collection. The orders were paid for by two checks, one for $28.20 and the other for $93.05, numbers 171 and 519 respectively, drawn on the special account payable to The Horchow Collection. The amounts of these checks were accurately recorded by petitioner on the stubs to which they correspond. The following checks were drawn on the special account payable to The Stitchery, a mail order house for needlepoint goods: Number
Date
Amount
11955
7/12/74
$ 32.80
143
1/2/75
84.35
273
2/26/75
73.75
$190.90
The proceeds of these checks were used to purchase needlepoint materials. In November 1973, petitioner purchased some records from the Chival/Stanyan Company for $40.45. These records were *269 paid for by a check for that amount, number 11352, drawn on the special account payable to Chival/Stanyan Co. The stub corresponding to this check was properly completed by petitioner. The total of all payments made on petitioner's Strawbridge and Clothier (hereafter "Strawbridge") charge account in 1973 is $2,853.40. This entire amount was paid by checks drawn by petitioner on the special account. These checks form part of the basis for respondent's determination of the deficiency for 1973. The total of all payments made on petitioner's Strawbridge account in 1974 is $1,600.35. Of this amount, $1,580.35 (all but $20) was paid by checks drawn on the special account which form part of the basis for the 1974 deficiency. The total of all payments made on petitioner's Strawbridge charge account between January 1, and August 1, 1975, is $864.44. This entire amount was paid by checks drawn on the special account which form part of the basis for the 1975 deficiency. In 1973, a total of $382.84 in checks drawn on the special account was paid on petitioner's Mastercharge account with the Provident National Bank and, in 1974, a total of $973.70 in checks drawn on the special account *270 was paid on her Mastercharge account. Additionally, a check for $79.94 (number 12397) was paid on Mr. Moskovitz's Mastercharge account in 1974. In 1975, a check for $248.06 (number 201) was drawn on the special account, and credited to Mr. Moskovitz's Mastercharge account. These checks from a part of the basis for the 1973, 1974, and 1975 deficiencies, respectively. In 1973, a total of $178.86 in checks drawn on the special account was paid on petitioner's Bankamericard account with the Philadelphia National Bank and, in 1974, a total of $528.34 in checks drawn on the special account was paid on her Bankamericard account. In addition, in 1975, a total of $592.05 in checks was paid on Mr. Moskovitz's Bankamericard account. These checks all form a part of the basis for the 1973, 1974, and 1975 deficiencies, respectively. Mr. Levy did not have a Bankamericard from Philadelphia National Bank during the years in issue. In 1973 and 1974, a total of $297.62 and $1,388.52 in checks drawn on the special account was paid to Bloomingdales. These checks from part of the basis for the 1973 and 1974 deficiencies. Mr. Levy had a charge account at this store during the years in issue. *271 The following checks were drawn on the special account payable to Sears department store. Check No.
Date
Amount
11222
8/22/73
$221.23
11816
5/13/74
135.52
12300
11/8/74
24.24
148
1/8/75
61.52
172
1/13/75
74.19
217
2/11/75
31.79
399
5/19/75
453.00
Check numbers 11816, 148, and 217 were credited to petitioner's charge account at Sears. The checks numbered 172 and 399 were credited to Mr. Moskovitz charge account at Sears, and the checks numbered 11222 and 12300 were credited to Mr. Levy's charge account. These checks all form part of the basis for the deficiencies determined for 1973, 1974, and 1975. In 1973, a check for $122.78 (number 11420) was drawn on the special account payable to Bamburger's department store, and credited to petitioner's charge account at that store. In 1974, a total of $570.57 in checks drawn on the special account was credited to her charge account at Bamburgers. These checks from a part of the basis for respondent's deficiency determination for 1973 and 1974. During 1974, there was a total of $859 paid with checks drawn on the special account payable to Friedman and Raph, petitioner's landlord, *272 as rent on her apartment. This amount represents rent for the 5-month period of June through October, paid between May 13 and August 12, 1974. In 1973, a total of $270.14 in checks drawn on the special account was paid on petitioner's charge account at Bonwit Teller. [4] In 1974, a check for $93 (number 11995) was drawn on the special account payable to Bonwit Teller and credited to her charge account at that store. In 1973, a total of $132.01 in checks drawn on the special account were credited to petitioner's charge account at Gimbel's department store and, in 1974, a check for $20 (number 11502) was drawn on the special account payable to Gimbels and credited to her charge account at that store. In 1973, checks totaling $84 were drawn on the special account payable to Lintree Hosiery.Lintree Hosiery is a mail order company from which petitioner ordered hosiery *273 herself and other office employees. She collected money to cover the cost of the orders she took from various office employees directly from those employees. The money collected was never returned to Mr. Levy. In 1973, a check for $30.40 (number 11334) was drawn on the special account payable to Current, Inc., a mail order company specializing in greeting cards and writing supplies. The stub corresponding the this check was properly completed. In addition, in 1974, the following checks were drawn on the special account payable to Current, Inc.: Check No.
Date
Amount
11934
7/8/74
$18.62
11998
7/30/74
30.00
12116
9/23/74
13.40
Total for 1974
$62.02
The stubs that correspond to these checks do not indicate that Current, Inc., was the payee. In 1974, a check for $35.50 (number 11993) was drawn on the special account payable to Frank Lewis Company, a mail order company located in Texas specializing in grapefruit gift packages. The checkbook stub corresponding to this check indicates a different payee. In addition, a check for $48.60 (number 141) was drawn on the special account in 1975 payable to Frank Lewis Co. The corresponding checkbook *274 stub for this check was properly completed. In 1973, a check for $29.81 (number 11006) was drawn on the special account payable to the Country Gourmet. The stub corresponding to this check indicates a different payee. In addition, the following checks were drawn on the special account in 1974 payable to the Country Gourmet: Check No.
Date
Amount
11505
1/4/74
$41.15
11882
6/7/74
17.44
11921
6/25/74
20.29
Total for 1974
$78.88
The stub corresponding to check number 11505 was properly completed, but the stubs corresponding to check numbers 11882 and 11921 indicate payees other than Country Gourmet. In 1973, a check for $72.90 (number 11286) was drawn on the special account payable to Figi's, a mail order company. The stub corresponding to this check however, indicates a different payee. In 1975, a check for $19.85 (number 223) was drawn on the special account payable to Figi's. The stub corresponding to this check does not indicate any payee.The order form which accompanied check number 223 instructed Figi's to send the items purchased to petitioner's nephew, Michael Salomone. In 1973, the following checks were drawn on the special account *275 payable to Miles Kimball, a mail order company located in Wisconsin: Check No.
Date
Amount
11290
9/24/73
$14.21
11353
11/1/73
19.52
Total for 1973
$33.73
The stub corresponding to check number 11290 indicates a payee other than Miles Kimball, but the stub relating to check number 11353 was properly completed. In addition, in 1974, the following checks were drawn on the special account payable to Miles Kimball: Check No.
Date
Amount
12044
8/15/74
$23.65
12105
9/19/74
14.59
Total for 1974
$38.24
The stub relating to check number 12044 does not indicate any payee, but the stub corresponding to check number 12105 was properly completed. Finally, in 1975, the following checks were drawn on the special account payable to Miles Kimball: Check No.
Date
Amount
220
2/18/75
$26.50
502
6/16/75
26.68
509
6/18/75
40.91
Total for 1975
$94.09
The stub relating to check number 220 was properly completed, the stub corresponding to check 502 does not indicate any payee, and the stub corresponding to check number 509 indicates a different payee. In 1973, the following checks were drawn on the special *276 account payable to Gerity Products, Inc.: [5]
Check No.
Date
Amount
11219
8/20/73
[6] $ 46.92
11329
10/18/73
84.77
11428
11/26/73
30.69
Total for 1973
$162.38
These checks were drawn on the special account to pay for silver items ordered by petitioner. The corresponding stub for check number 11219 was properly completed, but the stubs for check numbers 11329 and 11428 indicate payees other than Gerity Products. In 1974, the following checks were drawn on the special account payable to Joan Cook, a mail order company located in Florida: Check No.
Date
Amount
12112
9/19/74
$30.65
135
12/30/74
12.95
Total for 1974
$43.60
*277 The checkbook stub corresponding to check number 12112 does not indicate any payee, and the stub for check number 135 indicates a payee other than Joan Cook. In addition, in 1975, a check for $54.20 (number 425) was drawn on the special account payable to Joan Cook. The corresponding stub for this check does not indicate any payee. In 1973, the following checks were drawn on the special account payable to Kenton Collection: Check No.
Date
Amount
11320
10/2/73
$116.25
11335
10/21/73
90.90
Total for 1973
$207.15
The checkbook stubs corresponding to these checks indicate payees other than Kenton Collection. In 1974, the following checks were drawn on the special account payable to Bailey, Banks and Biddle, a jewelry store in Philadelphia: Check No.
Date
Amount
11876
5/31/74
$63.07
12143
10/7/74
23.32
$86.39
The stubs relating to both of these checks were properly completed by petitioner. In 1975, the following checks were drawn on the special account payable to Discovery House, a mail order company located in Connecticut: Check No.
Date
Amount
388
4/29/75
$39.75
428
5/15/75
40.40
Total for 1975
$80.15
*278 The stubs corresponding to both of these checks were properly completed by petitioner. In 1973, a check for $42 (number 11072) was drawn on the special account payable to Lord and Taylor, a department store and in 1974, a check for $111.80 (number 12374) was drawn on the special account payable to the same store. The checkbook stub for both these checks were properly completed. In 1973, the following checks were drawn on the special account payable to "Rich's": Check No.
Date
Amount
10883
3/14/73
$82.15
11282
9/10/73
31.19
Total for 1973
$113.34
The stub relating to check number 10883 was properly completed, but the stub corresponding to check number 11282 indicates a different payee. In 1974, a check for $26.03 (number 12060) was drawn on the special account payable to J. C. Penney. The corresponding checkbook stub for this check indicates a different payee. Additionally, in 1975, a check for $263.88 (number 514) was drawn on the special account payable to J. C. Penney, and credited to petitioner's charge account at this store. Mr. Levy did not have an account at J. C. Penney during the 3 years in issue. In 1973, the following checks *279 were drawn on the special account payable to Saks Fifth Avenue, a department store: Check No.
Date
Amount
10992
5/7/73
$ 66.00
11263
9/5/73
130.00
11325
10/5/73
41.00
11355
11/6/73
50.50
Total for 1973
$287.50
The stubs relating to these checks were properly completed by petitioner. In addition, the following checks were drawn on the special account payable to Saks Fifth Avenue in 1974: Check No.
Date
Amount
12041
8/7/74
$135.25
12102
9/16/74
271.61
12140
10/7/74
58.00
12308
11/8/74
46.40
Total for 1974
$511.26
The stub relating to check number 12041 indicates a different payee, but the stubs corresponding to check numbers 12102, 12140, and 12308 were properly completed.In 1975, a check for $175 (number 525) was drawn on the special account payable to Saks Fifth Avenue. The checkbook stub for this check was properly completed. In 1973, the following checks were drawn on the special account: Check No.
Date
Payee
Amount
10921
3/22/73
Savoy Co.
[7] $ 30.00
10925
3/28/73
Hess's
309.30
11075
6/11/73
Benson's
44.00
11139
7/3/73
Nice Pak
15.00
11212
8/7/73
Hattie Carnegie
29.50
Total for 1973
$427.80
*280 Check number 10925 was credited to petitioner's charge account at Hess's a department store in Philadelphia.Mr. Levy did not have an account at Hess's in 1973. The checkbook stubs corresponding to check numbers 10921, 11075, and 11139 were properly completed by petitioner, but the corresponding stub for check number 11212 indicates a payee other than the one shown above. The following checks were drawn on the special account in 1974: Check No.
Date
Payee
Amount
11498
1/4/74
St. Hubert's Alumni
$ 60.00
11499
1/4/74
Barbara Corbin
56.20
11889
6/17/74
Temple Music Fair
16.00
11992
7/29/74
Fosdick Corp.
10.00
12061
8/20/74
5 Minute Shapeup
10.95
12062
8/24/74
Drake and Sons
32.17
12064
8/26/74
Gourmet Books
36.00
12113
9/19/74
Harriet Carter
17.89
12136
10/1/74
Curtin Publications
10.26
12146
10/10/74
Pepperidge Farm
28.10
Total for 1974
$277.57
The checkbook stubs for check numbers 11498, 11992, and 12113 indicate payees other than those shown above, the corresponding stubs for check numbers 11499, *281 and 12146 do not indicate any payee at all, and the stubs to check numbers 12062, 12064, and 12136 were properly completed by petitioner. Check number 11889, payable to Temple Music Fair, was payment for concert tickets, and check number 12061, payable to 5 Minute Shapeup, was payment for an exercise wheel. Petitioner wrote a check (number 11498) drawn on the special account payable to St. Hubert's Alumni Association to pay for a fashion luncheon put on by the St. Hubert's Alumni Association. Petitioner took money from Janet Szlachta ostensibly to cover the cost of her ticket. The following checks were drawn on the special account in 1975: Check No.
Date
Payee
Amount
210
1/30/75
Chevron
$155.80
283
3/11/75
Jean Coren
31.15
335
3/31/75
Forrest Theatre
21.80
336
3/31/75
Fingerhut
23.96
427
5/12/75
Temple Music Fair
34.00
Total for 1975
$266.71
The stubs corresponding to check numbers 336 and 427 were properly completed, but the checkbook stubs for check numbers 283 and 335 indicate payees other than those shown above. Check number 210 was credited to Mr Moskovitz's Chevron charge account and check number 335, payable to the Forrest *282 Theatre, represents payment for theater tickets.Finally, the proceeds of check number 427, payable to Temple Music Fair, were used to pay for concert tickets. Petitioner had a power of appointment, granted by Mr. Levy, which allowed her to sign checks drawn on the special account. She and Mr. Levy were the only persons with authority to sign checks drawn on the special account from January 1, 1973 to August 14, 1975. Mr. Levy often drew checks on the special account when he needed cash, and on these occasions he would himself write out a check payable to "cash". If he was going to be out of town, he would often take some blank checks from the special account with him in case he needed cash while he was away. Other times, he would ask petitioner to make out the check, cash it and bring him the cash. Janet Szlachta went through the records that were available concerning the special account for the years in issue, and compiled a list of questionable checks that had been drawn by petitioner payable to "cash". The criteria used by Janet to identify questionable checks were (i) Mr. Levy was out of town when the check was cashed, (ii) there was a discrepancy between a check and the *283 stub to which it corresponded, and (iii) Mr. Levy had obtained cash himself by means of another check written on the same date. If any one of these circumstances existed with respect to a particular check, Janet noted that check on her list. Respondent included the amount of checks drawn on the special account to cash in the deficiencies for the years in issue on the same basis. Though petitioner was not formally trained as a bookkeeper, she did take some accounting courses and she did manage several bank accounts for Mr. Levy. A formal set of books was maintained for all of the accounts except the special account. Mr. Levy did not require that a set of books be kept for the special account because it was a personal account, used solely to pay his personal bills. Items that were deductible for Federal income tax purposes were paid out of the accounts for which books were kept. These books were regularly reviewed by an accountant employed by the company for which Mr. Levy worked. There were never any irregularities discovered in the books thus reviewed, but the accountant did not review the special account. Ms. Szlachta determined that Mr. Levy was out of town on the dates *284 indicated on the chart below by reference to his own personal calendars, a 1973 calendar maintained by petitioner, and other calendars maintained in Mr. Levy's office. Ms. Szlachta utilized these calendars in order to determine Mr. Levy's whereabouts on the dates when the "cash" checks were written on the special account by petitioner. Ms. Szlachta discussed each entry with Mr. Levy and she also reviewed airline tickets to determine the exact dates on which Mr. Levy was out of town. We also note that Mr. Levy resided at the New Jersey shore during the summer months of the years in issue. There were many checks drawn to "cash" on the special account that were not included in the deficiency determined by respondent. This is because Mr. Levy occasionally drew cash checks himself and sometimes took blank checks from the special account. The checks payable to cash that are in issue were included in the deficiency for the taxable years 1973, 1974, and 1975 because, according to respondent, the proceeds of these checks were used for petitioner's personal benefit. Each of the checks in issue were written on the special account by petitioner. The following chart, based on exhibit BA, *285 consists of the 70 checks payable to cash which were included by respondent in petitioners' income for the taxable years 1973, 1974, and 1975. The chart includes the check number, date, amount, notation on the check stub, and/or the whereabouts of Mr. Levy on the date of the check. As noted above, the checks listed are included in the understatements for the 3 years in issue either because Mr. Levy was out of town when the check was cashed, there was a discrepancy between the check and the corresponding checkbook stub, or it was determined that Mr. Levy had obtained cash himself by means of another check written on the same date. "Cash" Checks -- Money unaccounted for by Robert Levy (1973)
PAYEE
CHECK NO.
DATE
AMOUNT
EXPLANATION [8]
Cash
10762
1/19/73
$1,500
Stub-Francis S. McKelvey/N.Y.
and Fla. (cashed check #10736,
$1,000, 1/18/73).
Cash
10845
2/13
1,500
Stub-Phoebe Widmer, $150/N.Y.
2/13-2/15 P.M.
Cash
10907
3/16
500
Stub-Stein, Henry/Charlotte,
N.C., 3/14 thru 3/16.
Cash
10996
5/15
400
Out of town 5/14 thru 5/21,
golf outing.
Cash
10997
5/18
200
Out of town 5/14 thru 5/21,
golf outing.
Cash
11076
6/11
340
Stub-Lawrence J. Norton.
Cash
11081
6/15
200
N.Y. 6/14-6/15.
Cash
11082
6/15
500
From N.Y. 6/15 to Margate for
weekend.
Cash
11195
8/7
1,000
Stub-Jr. Baseball Federation.
Cash
11216
8/9
250
Stub-Little Quakers - pay back
loan ck. 11215, 8/9/74, $250
(Little Quakers pay back
loan).
Cash
11217
8/9
$ 500
Monmouth -- all day.
Cash
11220
8/22
700
Stub-Cash, $200.
Cash
11249
8/23
100
Stub-Cash, Mrs. Levy -- endorsed
by James Hogan.
Cash
11266
9/6
250
Mr. Levy at Atlantic City
Racing Assoc. 9/1 thru 9/17.
Cash
11285
9/13
1,000
Same as above.
Cash
11288
9/27
300
Mr. Levy at Atlantic City
Racing Assoc. 9/24 thru 9/28.
Cash
11322
10/4
1,000
Mr. Levy at Atlantic City
Racing Assoc. all day.
Cash
11330
10/19
200
Florida 10/17-10/18, Lehigh
10/19.
Cash
11331
10/19
300
Same as above.
Cash
11416
11/15
250
Stub-McKelvey & Son.
Cash
11426
11/21
500
Mr. Levy cashed own check at
Atlantic City Racing Assoc.
#11426, 11/21/73.
Cash
11436
12/11
250
Mr. Levy at Atlantic City
Racing Asso. in A.M.; to N.Y.
with Dr. Levy.
Cash
11448
12/17
1,500
Stub-Nan Duskin/Mr. Levy in
New Orleans, Las Vegas &
Florida, 12/15 thru 12/29.
Cash
11493
12/20
1,500
Mr. Levy in New Orleans, Las
Vegas and Florida 12/15 thru
12/29.
1973 Total
$14,740
"Cash" Checks -- Money unaccounted for by Robert Levy (1974)
Cash
11586
2/14/74
$ 340
Stub-Lawrence S. Norton.
Cash
11642
2/20
1,200
Stub-Void.
Cash
11647
3/1
600
Stub-$500.
Cash
11649
3/8
200
Mr. Levy to Detroit 3/6 to
N.Y. ret. 3/8; He took check
#11650 ($5,000) on 3/8.
Cash
11657
3/14
300
Stub-blank/Mr. Levy, Conn.
Cash
11755
4/17
1,000
Stub-$10.
Cash
11814
5/9
800
Stub-$500.
Cash
11823
5/17
500
Stub-blank.
Cash
11875
6/3
700
Stub-Meyers $7/Mr. Levy
meeting Marco Island ret. 6/4.
Cash
11879
6/6
200
Stub-blank.
Cash
11917
6/17
225
Stub-$25 reimbursement for
money spent on gift
certificate for Linda Magoon.
Cash
11920
6/25
200
Mr. Levy-Montreal, 6/24-6/29.
Cash
11927
7/1
500
Mr. Levy-Ocean Beach Club,
7/1-7/7, took blank check with
him.
Cash
11932
7/3
200
Same as above.
Cash
11938
7/10
600
Stub-$600.
Cash
12038
8/8
2,700
Stub-void.
Cash
12050
8/16
600
Stub-Bonwits/Mr. Levy in
Monmouth A.M./N.H. noon.
Cash
12097
9/10
300
Mr. Levy-Lexington, KY-9/10.
Cash
12139
10/4
300
Mr. Levy-Atlantic City Racing
Assoc., took check #12138-$2000.
Cash
12335
11/8
$ 300
Stub-void-ck. #12335, $500
cash for Mr. Levy, 11/8.
Cash
12256
11/25
500
Stub-Saks, $711.79.
Cash
12257
12/13
200
Stub-Bloomingdale's, $186.45.
Cash
133
12/30
1,000
Mr. Levy-Hawaii 12/23-12/30,
12/30 Phoenix.
1974 Total
$13,465
"Cash" Checks - Money unaccounted for by Robert Levy (1975)
Cash
156
1/10/75
500
Stub-Lamps-Mary, $269-Wage
Electric Co.
Cash
12258
1/17
500
Stub-Mary Kemp, $50.
Cash
208
1/21
200
Stub-Void.
Cash
207
1/27
200
Stub-Sears, $200-Void.
Cash
272
2/24
400
Stub-Cash, $100.
Cash
282
3/7
300
Stub-Void/Mr. Levy-Greensboro,
N.C. 3/5, ret. 3/7 evening.
Cash
285
3/12
1,300
Stub-$300.
Cash
320
3/14
500
Stub-Blum Store, $465.13.
Cash
332
3/21
500
Stub-Void.
Cash
333
3/26
500
Stub-void/Mr. Levy-Bahamas
3/25, ret. to Phila. on 3/30,
and left for Fla. thru 4/2.
Cash
398
4/29
300
Mr. Levy took ck. #424 on
4/29, ($500).
Cash
441
5/8
100
Mr. Levy-Geneva, London &
Athens 5/6 thru 5/16.
Cash
442
5/12
100
Same as above.
Cash
459
5/22
$3,000
Stub-Void
Cash
454
6/3
1,500
Stub-Phila. Traffic Court,
$15.
Cash
507
6/16
$ 200
Stub-blank/Mr. Levy-Denver
6/13 thru 6/17.
Cash
520
6/20
200
Stub-Void/Mr. Levy at Atlantic
City Racing Assoc. all day.
Cash
513
6/25
1,500
Stub-Traffic Court, $15/Mr.
Levy-Dallas 6/24-6/26.
Cash
547
6/27
1,500
Stub-blank, $15/Mr. Levy-Atlantic
City Racing Assoc.
Cash
556
7/15
800
Mr. Levy at Atlantic City
Racing Assoc. all day.
Cash
567
7/17
1,000
Stub-$100/Mr. Levy at
Atlantic City Racing Assoc.
all day.
Cash
592
7/21
500
Mr. Levy-Lexington 7/20-7/22
to Pomona, N.J. in evening.
Cash
453
5/29
300
Mr. Levy-Monmouth Park.
1975 Total
$15,900
*286 Mr. Moskovitz and petitioner were married on November 30, 1974, and thus were permitted to and did file joint Federal income tax returns for 1974 and 1975. Mr. Moskovitz first learned that there was a question regarding the Levy Special Account and his wife's possible embezzlement activities when a summons was delivered to his home in March 1976. We note that Mr. Moskovitz signed the couple's 1975 tax return in January of 1976, well before the date that the summons was delivered. At home, petitioner wrote most of the personal checks for herself and her husband. She paid the bills, retained most of their credit cards, made the bank *287 deposits for both, reconciled their bank statements, kept all of the financial books and rarely consulted her husband about any of these matters. She also deposited Mr. Moskovitz's paycheck and gave him just enough for spending money. Mr. Moskovitz did not receive any expensive gifts from petitioner while they were married in 1974 or 1975. He purchased his car by trade-in and long-term financing, and paid for his and his wife's honeymoon with his own personal savings. Mr. Moskovitz and petitioner purchased their residence with money they borrowed from petitioner's father. Mr. Moskovitz did not receive any significant benefit either directly or indirectly from the income items which were omitted from petitioners' gross income during the years in issue. OPINION Amount of Embezzlement Income
The first issue for decision is the amount of income petitioners must recognize from petitioner's embezzlement activities. Respondent asserts that petitioner misappropriated funds from her employer, Mr. Levy, which she failed to include in her gross income in each of the taxable years 1973 through 1975. We agree. *288 Section 61(a) defines gross income as "all income from whatever source derived * * *." Section 1.61-14(a), Income Tax Regs., provides that "[i]llegal gains constitute gross income." Moreover, it is well-established that embezzled funds constitute gross income to the embezzler in the year the funds are misappropriated. Solomon v. Commissioner,732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court; Rappaport v. United States,583 F.2d 298, 302 (7th Cir. 1978); Bailey v. Commissioner,420 F.2d 777, 778 (5th Cir. 1969), affg. per curiam 52 T.C. 115 (1969); Nerem v. Commissioner,41 T.C. 338, 341-344 (1963). When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though *289 he may still be adjudged liable to restore its equivalent" * * * In such case, the taxpayer has "actual command over the property taxed -- the actual benefit for which the tax is paid." * * * [James v. United States,366 U.S. 213, 219 (1961)]. Petitioners contend that respondent has the burden of proving that they received unreported income during the 1973, 1974, and 1975 taxable years, and that petitioners failed to report such income on their Federal income tax returns. Petitioners cite Taylor v. Commissioner,70 F.2d 619, 621 (2d Cir. 1934), as authority for the proposition that where respondent's Notice of Deficiency alleges omissions from taxable income, the burden of proof rests upon the Government. Respondent alleges that petitioners' reliance on Taylor is misplaced. We agree with respondent. The Taylor court clearly upheld the traditional view that the burden of proof with respect to respondent's deficiency determination is on petitioner. Rule 142(a) [9]; Welch v. Helvering,290 U.S. 111 (1933). Only after proving respondent's determination to be erroneous, would the Taylor court relieve the taxpayer *290 of the burden of proving that he did not owe any tax. [T]he taxpayer has the burden of proving * * * [respondent's deficiency] was wrong, after he has done so, he need not * * * prove that he owed no tax, or what was the tax that he did owe. The original assessment rested upon a finding, presumptively correct, but the presumption of its correctness does not extend to other findings which the Commissioner has never made. * * * [Taylor v. Commissioner,supra at 621.] Petitioners' reliance on Weir v. Commissioner,283 F.2d 675, 679 (6th Cir. 1960), is similarly inappropriate. In Weir, the Court of Appeals for the Sixth Circuit held that no presumption of correctness attached to the Commissioner's determination and that the Government had to affirmatively prove its case. This, result occurred however, because respondent conceded that his determination was erroneous with respect to a substantial amount, this Court found an error in respondent's determination *291 as to an additional amount, and petitioner gave clear and uncontradicted testimony that he had not received certain of the alleged income he was being charged with. In Weir, respondent failed to present any affirmative evidence whereas, in the instant case, respondent has presented substantial documentary and testimonial evidence supporting the Commissioner's deficiency determinations and we therefore find the facts and the reasoning in Weir to be inapposite. [10]
Procedure for Determining Amounts of Understatements for 1973, 1974 and 1975
Petitioner worked for Mr. Levy as his personal secretary and bookkeeper. She managed several bank accounts for *292 him in this capacity including one called the special account out of which Mr. Levy paid his personal expenses.No formal books were kept for this account. Petitioner had a power of attorney which allowed her to sign checks drawn on the special account. The deficiencies in this case are based on individual checks drawn on the special account by petitioner that inured to her benefit, and which Mr. Levy claims were not authorized. Specific testimony has been offered to support respondent's determinations. [11]
We believe that petitioner did embezzle money from Mr. Levy. She was able to do so essentially as follows: She maintained the checkbook for the special account. She would submit bills to Mr. Levy that had to be paid and he would write checks from *293 another account in an amount sufficient to allow the bills to be paid from the special account once these checks from the other account had been deposited into the special account. In order to do this, of course, Mr. Levy had to know the current balance in the special account. He would simply ask petitioner what it was. Petitioner did not keep a running balance in the checkbook, so he could not otherwise check. By systematically understating the balance in the account, petitioner could build up substantial reserves which she then drew on by writing unauthorized checks to cash, and by writing unauthorized checks to petitioners' creditors. The same result was sometimes obtained in a slightly different manner: If petitioner and Mr. Levy happened to have a charge account at the same store, petitioner would sometimes submit one of Mr. Levy's bills from that store to him, along with other bills, and he would write a check from another account to cover the bills thus submitted in an amount sufficient to allow the bills to be paid from the special account once the check had been deposited. Petitioner would then write a check to that store and have it credited toherown *294 account. If Mr. Levy found out that his bill had not been paid, petitioner would make some excuse which would allow her to resubmit the bill to Mr. Levy who would then write another check to provide for its payment. [12]
We do not, however, believe that petitioner embezzled as much money as respondent alleges she did. On the facts before us, the volume of checks *295 drawn on the special account which apparently inured to petitioner's benefit is extraordinary. For example, between January 1, 1973 and August 1, 1975, (at which point petitioner left Mr. Levy's employ) a total of $3,378.10 was paid on petitioner's charge account at Wanamaker's. Of this amount, all but $13 was paid by checks drawn by petitioner on the special account. On occasion, Mr. Levy had petitioner buy things on her own charge accounts, for him, his friends, and his family, and he would reimburse her either directly or by paying her creditor. This reimbursement would be effected by a check from the special account, which probably would have been drawn by petitioner herself. This clearly occurred far more often than Mr. Levy (whom we did not find to be a particularly credible witness) now admits. In particular, we seriously doubt that Mr. Levy would have failed to notice that approximately $20,000 per year was being siphoned off of his personal checking account. The best we can do in this case is to look at each check which forms a part of the deficiency, and ask whether the record supports the conclusion that it was drawn at Mr. Levy's behest, or covertly by petitioner *296 for her own benefit. The checks which form the basis for the deficiencies determined in this case fall into two broad categories: (1) checks made payable to third parties; and (2) checks made payable to cash. The checks made payable to third parties have been called into question because either (a) they were paid to one of petitioners' creditors, e.g., credited to one of petitioners' charge accounts at a store (See Appendix I); (b) the stubs in the checkbook indicate a payee or amount different from that indicated on the corresponding check (see Appendix II); or (c) Mr. Levy does not recall buying anything from the indicated payee. We will accept the first two of these criteria as probative of embezzlement. The last criteria, however, must be rejected because we find Mr. Levy often had petitioner purchase items for his family and friends, and he left it to petitioner to order or pick up such things. That Mr. Levy does not remember sending a fruit basket to a friend, or that he forgot certain other items, did not particularly impress us. Additionally, the law imposes a lesser burden upon *297 a taxpayer who is called upon to prove a negative (e.g., that he did not receive the income which the Commissioner claims he received) than is imposed upon a taxpayer who is attempting to sustain a deduction. Weir v. Commissioner,283 F.2d 675 (6th Cir. 1960), remanding a Memorandum Opinion of this Court. See also Taylor v. Commissioner,70 F.2d 619, 621 (2d Cir. 1934), affd. 293 U.S. 507 (1935). One reason for this is that * * * deductions are matters of legislative grace, and the burden of proving them and their correct amount rests upon the taxpayers, entirely aside from the consideration of any presumption of correctness that attaches to the Commissioner's determination * * *. [Weir v. Commissioner,supra at 679.] Thus, we believe that petitioner meets her burden of proof where she is able to show that there is no rational basis for the inclusion of the amount of a check in the understatement. Therefore, if a check is not suspicious by virtue of one of the first two criteria set forth above, we will reduce the understatement for the year in which the check was drawn, notwithstanding that Mr. Levy *298 testified that he does not remember authorizing the check in question. As to checks paid to petitioners' creditors, we find that Mr. Levy did sometimes have petitioner purchase things for him on her own charge accounts. He would sometimes reimburse her by paying her creditors. Therefore, where petitioner gave a credible account of a particular purchase on her charge, the amount of that purchase was subtracted from the understatement in the year in question. As to discrepancies between checks and corresponding stubs, as we shall note below, this criteria was also used to include checks drawn to cash in the understatements as well. Petitioner has argued that she was just very "sloppy" about keeping records for this account. We find that she was too sophisticated in general, and too competent as a bookkeeper in particular, to have been as consistently sloppy as she claims. [13] On the other hand, we believe she was sloppy to some degree, and made some mistakes not attributable to sloppiness. Therefore, where petitioner gave a credible account of a purchase or cash transaction, the amount thereof was subtracted from the understatement for the year in issue, notwithstanding that *299 the check and stub involved do not match. Checks payable to "cash" have been called into question because either (a) the check and corresponding stub do not match; (b) Mr. Levy was out of town on the day the check was drawn -- and so presumably would not have asked petitioner to get him any cash on that particular date; or (c) Mr. Levy obtained cash by another check, which he himself signed, on the same date. We accept all of these criteria as probative of embezzlement, subject, however, to a satisfactory explanation by petitioners. Where, for example, petitioner wrote someone's name in the space provided for the payee on a check stub, and Mr. Levy admitted that the person named is someone to whom he might have given the amount in question, the understatement in question was reduced by this item. A. Checks Drawn on the Special Account, Payable to Third Parties and Removed from the Understatement
*300 (1) Respondent has conceded that a check in the amount of $30 (No. 10921) payable to the Savoy Company represents a payment for the benefit of Mr. Levy. We will reduce the 1973 understatement accordingly. (2) Petitioner purchased certain items for friends and associates of Mr. Levy at his request. For instance, in April of 1973, she bought a "baby set" at Wanamaker's for Mr. Levy to give as a gift to the wife of a friend.The cost of the baby set ($32) was charged to petitioner's own account at the store. In May 1973, a check for $60.50 (No. 10989) was drawn on the special account and credited to petitioner's account at Wanamaker's. The corresponding check stub matches the check in issue. We will reduce the 1973 understatement by $32. [14]
*301 (3) In June 1973, petitioner purchased two swimsuits and two games at Wanamaker's for a total of $59.36 all of which amount was charged to her own account at the store. The swimsuits were purchased by Mary for one of Mr. Levy's friends and the two games were purchased for the Levy children. In July 1973, a check for $126.99 (No. 11140) was drawn on the special account at Wanamaker's and credited to petitioner's account. The stubs corresponding to these checks were properly completed by petitioner. We will reduce the 1973 deficiency by $59.36. (4) In August of 1973, petitioner bought a record (or some record) for Mr. Levy's daughter at Wanamaker's. She made this purchase by placing a charge of $2.86 on her own account at that store. In September of 1973, a check for $45.86 (No. 11262) was drawn on the special account payable to Wanamaker's and credited to petitioner's account at that store. The checkbook stub corresponding to check number 11262 was properly completed by petitioner. We will reduce the 1973 understatement by $2.86. (5) In January of 1974, petitioner bought a backgammon game and two puzzles for Mr. Levy's children at Wanamaker's. The cost of these items *302 ($16.94) was charged to petitioner's own account at the store. In February 1974, a check for $41.94 (No. 11581) was drawn on the special account payable to Wanamaker's and credited to petitioner's account. The stub corresponding to this check was properly completed by petitioner. We will reduce the 1974 understatement by $16.94. (6) Mr. Levy gave petitioner some gifts during the period that she worked for him, including an engagement present and a wedding present. In April of 1974, and in June of that year, petitioner purchased crystal at Wanamaker's for $311.64 and $114.48, respectively. These amounts were charged to petitioner's own account at the store. In May 1974, a check for $335.14, (No. 11800) was drawn on the special account payable to Wanamaker's and in July 1974, a check for $351.35, number 11936, was drawn payable to the same store. Both of these checks were credited to petitioner's account. The corresponding stubs were properly completed. Because we find that the crystal purchased on these two occasions constituted an engagement present from Mr. Levy, we will reduce the 1974 understatement by $426.12. (7) Check number 183, in the amount of $51.08, was drawn *303 on the special account payable to Wanamaker's. This check was part of the basis for the 1975 deficiency. Although Wanamaker's is one of petitioner's creditors, there is no evidence in the record that the check was credited to her account. We will reduce the 1975 understatement by $51.08. (8) In November of 1973, petitioner purchased some records for Mr. Levy's daughter from the Chival/Stanyan Co. for $40.45. These records were paid for by a check for that amount (No. 11352) which was drawn on the special account payable to Chival/Stanyan Co. The stub corresponding to this check was properly completed. We will reduce the 1973 understatement by $40.45. (9) The following checks were drawn on the special account payable to The Horchow Collection: Number
Date
Amount
11811
5/13/74
$ 99.60
11884
6/11/74
20.95
12101
9/13/74
110.80
12114
9/20/74
75.50
12119
9/27/74
241.70
$548.55
The corresponding checkbook stubs were all properly completed by petitioner and these checks are not otherwise suspicious. Furthermore, there is nothing in the record to indicate that the merchandise ordered went anywhere other than to Mr. Levy's office. We will *304 reduce the 1974 understatement by $548.55. In addition, in January of 1975, and again in June of that year, petitioner ordered items from The Horchow Collection catalog for Mrs. Levy. The orders were paid for by two checks, one for $28.20 and the other for $93.05 (Nos. 171 and 519, respectively) drawn on the special account payable to The Horchow Collection. The amounts of these checks were properly recorded on the corresponding stubs. We will reduce the 1975 understatement by $28.20 and $93.05. (10) The following checks were drawn on the special account payable to the Stitchery, a mail order house for needlepoint. Number
Date
Amount
11955
7/12/74
$ 32.80
143
1/2/75
84.35
273
2/26/75
73.75
$190.90
These checks were used to purchase needlepoint materials for Mrs. Levy or her daughters. We will reduce the 1974 and 1975 understatement accordingly. (11) The following checks were drawn on the special account payable to Gerity Products, Inc.: Number
Date
Amount
11219
8/30/73
[15] $ 46.92
11329
10/18/73
84.77
11428
11/26/73
30.69
$162.38
These checks were drawn on the special account to pay for silver *305 items ordered by petitioner for Mr. Levy's wife. We therefore will reduce the 1973 understatement by $162.38. (12) In November of 1973, petitioner bought a coat at Bonwit Teller for one of Mr. Levy's friends for $84 which was charged to petitioner's account at that store. In December of that year, a check for $84 (No. 11431) was drawn on the special account which was credited to petitioner's account at Bonwit Teller. The corresponding stub was properly completed. We will reduce the 1973 understatement by $84. (13) In 1973, a total of $297.62 in checks drawn on the special account was paid to Bloomingdale's (Nos. 10991, 11070, 11141, 11261, and 11348); and in 1974, a total of $1,388.52 in checks drawn on the special account was paid to the same store (Nos. 11501, 11799, 12066, 12132, 12134, and 12389). Mr. Levy had a charge account at this store during the years in issue. There is nothing in the record to indicate that these amounts were not credited to Mr. Levy's own account at Bloomingdale's. In addition, the checks and their corresponding stubs were properly completed *306 by petitioner. We will reduce the 1973 and 1974 understatements by $297.62 and $1,388.52, respectively. (14) Check numbers 11222 and 12300 were drawn on the special account payable to Sears department store in the amounts of $221.23 and $24.24, respectively. Respondent has conceded that these checks represented payments made for the benefit of Mr. Levy and we will reduce the 1973 and 1974 understatement accordingly. (15) In 1973, a check for $30.40 (No. 11334) was drawn on the special account payable to Current, Inc., a mail order company specializing in greeting cards and writing supplies. The corresponding stub was properly completed, and the statement read into the record in lieu of having Mrs. Levy testify does refer to stationary. We will therefore reduce the 1973 understatement by $30.40. (16) In 1975, a check for $48.60 (No. 141) was drawn on the special account payable to Frank Lewis Co. Although Mr. Levy does not recall ordering merchandise from this company, the corresponding stub was properly completed by petitioner and we will therefore reduce the 1975 understatement by $48.60. (17) In 1974, check number 11505 was drawn on the special account payable to the *307 Country Gourmet in the amount of $41.15. The stub corresponding to check number 11505 was properly completed. We will reduce the 1974 understatement by $41.15. (18) In 1973, check number 11353 was drawn on the special account payable to Miles Kimball, a mail order company, in the amount of $19.52. The stub and the corresponding check match and we will reduce the 1973 understatement by this amount. We will reduce the 1974 understatement by $14.59 to reflect the fact that check number 12105, drawn on the special account payable to Miles Kimball, matches its corresponding stub, and we will reduce the 1975 understatement by $26.50 to reflect the fact that check number 220, drawn on the special account payable to Miles Kimball, matches its corresponding checkbook stub. (19) In 1974, two checks were drawn on the special account (Nos. 11876 and 12143) payable to Bailey, Banks and Biddle, a jewelry store in Philadelphia, in the amount of $63.07 and $23.32, respectively. The corresponding checkbook stubs for both of these checks were properly completed by petitioner and we will therefore reduce the 1974 understatement by $86.39. (20) We will reduce the 1975 understatement by $80.15 *308 to account for the fact that the stubs corresponding to the checks numbered 388 and 428 were properly completed by petitioner. These checks were both payable to Discovery House, a mail order company. (21) In 1973, check number 11072 for $42, and in 1974, check number 12374 for $111.80 were drawn on the special account payable to the Lord and Taylor department store. In both cases, the corresponding check stubs were properly completed by petitioner. We note that there is nothing in the record to indicate that these checks were credited to petitioner's charge account at Lord and Taylor. However, in their Request for Findings of Fact (number 109), petitioners admit that these checks were credited to petitioner's charge account. Therefore, we will make no reduction in the 1973 or 1974 understatement for these checks. (22) The 1973 understatement will be reduced by $82.15 to reflect the fact that the stub corresponding to check number 10883, payable to "Rich's", was properly completed by petitioner. (23) In 1973, 1974, and 1975, the following checks were drawn on the special account payable to Saks Fifth Avenue: Check No.
Date
Amount
10992
5/7/73
$ 66.00
11263
9/5/73
130.00
11325
10/5/73
41.00
11355
11/6/73
50.50
Total for 1973
$287.50
*309 Check No.
Date
Amount
12102
9/16/74
$271.61
12140
10/7/74
58.00
12308
11/8/74
46.40
Total for 1974
$376.01
Check No.
Date
Amount
525
6/27/75
$175
All of the stubs corresponding to the checks listed above were properly completed. Although there is nothing in the record to indicate that any of these checks were credited to a charge account of petitioner's at Saks, Petitioners' Requested Finding of Fact (Number 109) provides that the checks in issue were credited to petitioner's account. Ms. Szlachta testified that she wrote to all the stores at which Mr. Levy had an account to determine which checks were credited to these accounts. Because Mr. Levy did in fact have a charge account at Saks during the years in issue, and because the corresponding check stubs were properly completed, we will reduce the understatement for each year accordingly. (24) In 1973, the following checks were drawn on the special account: Check No.
Date
Payee
Amount
11075
6/11/73
Bensons
44
11139
7/3/73
Nice Pak
15
$59
The stubs corresponding to these checks were properly completed by petitioner and therefore, *310 we will reduce the 1973 understatement accordingly. (25) The following checks were drawn on the special account in 1974: Check No.
Date
Payee
Amount
11889
6/17/74
Temple Music Fair
$ 16.00
12062
8/24/74
Drake and Sons
32.17
12061
8/20/74
5 Minute Shapeup
10.95
12064
8/26/74
Gourmet Books
36.00
12136
10/1/74
Curtin Publications
10.26
$105.38
The stubs corresponding to checks numbers 12062, 12064, and 12136 were properly completed by petitioner and the 1974 understatement will be reduced by $78.43. The understatement for 1974 will also be reduced by $16 to account for the fact that check number 11889 was used to purchase concert tickets for members of the Levy family. The 1974 understatement will be further reduced by $10.95 because check number 12061 was used to purchase an exercise wheel which Mr. Levy gave to a friend. (26) The following checks were drawn on the special account in 1975: Check No.
Date
Payee
Amount
335
3/31/75
Forrest Theatre
$21.80
336
3/31/75
Fingerhut
23.96
427
5/12/75
Temple Music Fair
34.00
$79.76
The stub corresponding to the check numbered 336 was properly *311 completed and therefore we will reduce the 1975 understatement by $23.96.The 1975 understatement will be further reduced by $21.80 to account for check number 335 which was used to pay for theatre tickets for Mrs. Levy or their children. In addition, because check number 427 was used to pay for concert tickets purchased for members of the Levy Family, the 1975 understatement will also be reduced by $34. B. Checks Drawn on the Special Account and Made Payable to "Cash"
Petitioner had a power of appointment granted by Mr. Levy which allowed her to sign checks on the special account. Petitioner and Mr. Levy were the only persons with authority to sign checks drawn on this account during the period in issue. Petitioner maintained the checkbook for the special account from January 1, 1973 to August 14, 1975. On many occasions, Mr. Levy would himself write out a check to "cash" and, if he was going to be out of town, he would sometimes take blank checks from the special account with him in case he needed cash while he was away. On other occasions, Mr. Levy would ask petitioner to make out the check, cash it and bring him the cash. Though petitioner was not formally trained *312 as a bookkeeper, she did take some accounting courses and she did manage several bank accounts for Mr. Levy. Formal sets of books were kept for all of the accounts except the special account. Records were not maintained for the special account because it was a personal account, used only to pay personal bills. All deductible expenses were paid out of the accounts for which books were kept. These books were reviewed on a regular basis by an accountant employed by the company for which Mr. Levy worked. There were no improprieties discovered in the books thus reviewed, but the accountant did not review the special account. Janet Szlachta went through the records that were available with regard to the special account for the years in issue, and compiled a list of controversial checks that had been drawn by petitioner payable to cash. The criteria used by Janet to identify questionable checks were (i) that Mr. Levy was out of town when the check was cashed; (ii) that there was a discrepancy between a check and the corresponding stub, and/or (iii) that Mr. Levy had himself obtained cash by means of another check written on the same date. If any one of these circumstances existed *313 with respect to a particular check, Janet noted that check on her list. Respondent included the amount of checks drawn on the special account to cash in the deficiencies for the years in issue on the same basis. At trial, petitioner testified that differences in check and stub amounts and payees may have resulted from her practice of writing a batch of checks and filling in the stubs at a subsequent time. She said that she sometimes did not fill in the checkbook stubs at all, relying entirely on the bank statement for documentation.She said that when she wrote a check payable to cash she would sometimes make a notation on the line designated "payee," indicating who received the cash. We think that petitioner was too competent a bookkeeper to have been as consistently sloppy as she claims. On the other hand, we think that petitioner was capable of making some mistakes. Thus, if petitioner was able to provide this Court with a reasonable explanation of the circumstances surrounding the check in controversy, she will have sustained her burden of proof and we will reduce the understatement accordingly. With only one exception, petitioner has been unable to provide any such explanation. *314 Mr. Levy gave petitioner $500 to be used toward the purchase of a wedding gift. In November 1974, the month in which petitioner and Mr. Moskovitz were married, a check for $500, number 12263, was drawn on the special account payable to petitioner. This check, however, was signed by Mr. Levy and is consequently not one of the checks which form the basis for the deficiency for 1974 determined by respondent. In January 1975, however, another check for $500, number 156, was drawn on the special account payable to cash. This check was signed by petitioner, and does form part of the basis for the 1975 deficiency. Petitioner testified that she received the $500 from Mr. Levy as a gift to purchase some lamps. The words "lamps-Mary" are written on the stub which corresponds to check number 156, but neither the amount of the check nor the payee is accurately reflected on the stub.Check number 156 therefore, will remain part of the 1975 understatement. The stub corresponding to check number 11875 reads "Meyers" and the amount shown is $7. Check number 11875 however, was made payable to "cash" in the amount of $700. Mr. Levy testified that Rickey Meyers was a friend to whom *315 he might well have given $700. We will reduce the understatement for 1974 accordingly. Check numbers 454 and 513 both cleared to cash for $1,500. The stubs corresponding to these checks both indicate that they were payable to "traffic court" in the amount of $15. [16] Petitioner testified at trial that cash in the amount of $1,500 was obtained with both these checks and paid (presumably as bribes) to the Chief Judge of the Philadelphia Traffic Court. Petitioner claimed that Mr. Levy instructed her to disguise these payments by writing "$15" on the check stubs in question. Of course, Mr. Levy has denied all this, and we will dismiss this explanation because it involves petitioner's unsupported and self-serving allegations of wrongdoing. Thus, with only one exception (check number 11875), petitioner has failed to sustain her burden of proof with regard to these checks and no reduction in the 1973, 1974, or 1975 understatement will be afforded. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). *316 Those checks payable to cash totaling $14,740, $12,765, and $15,900 will therefore remain a part of the understatements as determined for the 1973, 1974, and 1975 taxable years, respectively. Statute of Limitations -- Section 6501
Section 6501(e)(1)(A) provides an exception to the normal 3-year statute of limitations where a taxpayer omits properly includable income from his return in an amount that exceeds 25 percent of the amount of gross income stated on the return. [17] In such a case, the generally applicable 3-year limitations period is extended to 6 years. *317 In order to invoke the 6-year statute of limitations pursuant to section 6501(e)(1)(A), respondent has the burden of proving the requisite omission. Bardwell v. Commissioner,38 T.C. 84 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Seltzer v. Commissioner,21 T.C. 398 (1953); Reis v. Commissioner,1 T.C. 9 (1942), affd. 142 F.2d 900 (6th Cir. 1944). Respondent may meet this burden of proof only by affirmative evidence. The presumption of correctness that normally attaches to respondent's deficiency determinations may not be relied upon in this regard. Reis v. Commissioner,supra.
Respondent has, in the instant case, offered affirmative evidence that does, even in the absence of the presumption of correctness, establish by a preponderance of the evidence that petitioners failed to report properly includable income on their return in an amount in excess of 25 percent of the amount of gross income stated on their returns. As discussed above, the checks which form the basis for the deficiencies *318 determined in this case fall into two broad categories: (1) checks made payable to third parties, and (2) checks made payable to "cash." The checks made payable to "cash" have been called into question because either (a) the check and the corresponding checkbook stub do not match; (b) Mr. Levy was out of town on the date on which the check was drawn; or (c) Mr. Levy obtained cash by another check, which he himself signed on the same date.We accepted each of these criteria as being indicative of embezzlement. On only one occasion, regarding a check in the amount of $700, was petitioner able to provide this Court with a satisfactory explanation. Petitioners' gross income for the 3 years in issue, as stated on their returns was as follows: Taxable Year Ending
Gross Income
December 31, 1973
$11,175.81
December 31, 1974
20,608.00
December 31, 1975
21,004.00
The proceeds of the checks payable to "cash" totaled $14,740, $12,765, [18] and $15,900 for the 1973, 1974, and the 1975 taxable years, respectively. Because these omitted amounts clearly exceed 25 percent of the stated amounts in each year, the 6-year statute of limitations of section 6501(e)(1)(A) applies. *319 Therefore, assessment of taxes due for 1973, 1974, and 1975 would have been timely pursuant to section 6501(e)(1)(A) through April 16, 1980, April 16, 1981, and April 16, 1982, respectively. [19]
The statutory notice of deficiency for each of the disputed taxable years was duly mailed on December 3, 1981. This notice is clearly timely with regard to the 6-year statute of limitations applicable to the return for the taxable year 1975. [20] However, it is beyond the 6-year expiration date which applied to petitioners' 1973 and 1974 tax returns. Respondent is nevertheless not barred from assessing the deficiencies for the 1973 and 1974 taxable years by mailing the notice of deficiency on December 3, 1981. *320 On September 15, 1979 and June 15, 1980, petitioner executed forms 872 consenting to extensions of the statute of limitations with regard to her 1973 Federal income tax return to December 31, 1980 and December 31, 1981, respectively. In both instances, petitioner's consent was expressly conditioned on the applicability of the 6-year statute of limitations under section 6501(e)(1)(A). On June 15, 1980, petitioner and Mr. Moskovitz executed a Form 872 consenting to an extension with regard to their 1974 joint return to December 31, 1981. Petitioners' consent for 1974 was also expressly conditioned on the applicability of the 6-year statute. Therefore, these agreements serve to extend the otherwise applicable 6-year statute of limitations applicable to the 1973 and 1974 taxable years. We hold that the notice of deficiency was timely mailed to petitioners with regard to all 3 of the taxable years in issue. Innocent Spouse Provision -- Section 6013(e)
Petitioners have sought to qualify Mr. Moskovitz for relief from liability under the innocent spouse provision found in section 6013(e). According to respondent, section 6013(e) is not applicable to relieve Mr. Moskovitz of *321 joint and several liability for the deficiencies and additions to tax resulting from petitioners' underreporting of taxable income. [21]
*322 Petitioners have the burden of proving that all four of the statutory prerequisites for relief pursuant to section 6013(e) have been satisfied. Rule 142(a); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). The first requirement of section 6013(e) is that a joint return must be made for each of the taxable years in issue. Section 6013(e)(1)(A). In the instant case, the parties both agree that petitioners filed joint Federal income tax returns in 1974 and 1975, but not in 1973. Respondent contends, however, that petitioners have failed to satisfy the remaining requirements of section 6013(e) insofar as 1974 and 1975 are concerned. In order to be relieved of liability, there must be a "substantial understatement of tax attributable to grossly erroneous items of one spouse." Section 6013(e)(1)(B). [22]Section 6013(e)(2) defines the term "grossly erroneous items" to include, with respect to any spouse "any item of gross income attributable to such spouse which is omitted from gross income." Based on the record as a whole, we are satisfied that petitioner had exclusive control over her embezzlement activities which constitutes the source of the unreported *323 income in the instant case. Accordingly, we conclude that because the omitted income created an understatement of tax in excess of $500, petitioners have satisfied the requirements of section 6013(e)(1)(B). Petitioners must next satisfy the third element of section 6013(e) which requires that the spouse seeking relief under this provision establish that "in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement." Section 6013(e)(1)(C). In order for petitioners to satisfy petitioners' burden of proof with respect to whether he had reason to know of the omitted income, Mr. Moskovitz "must establish that a reasonably prudent taxpayer, with * * * [his] knowledge of the family finances, would have no reason to know of the omission." Estate of Jackson v. Commissioner,72 T.C. 356, 361 (1979). *324 For the following reasons, we do not believe that Mr. Moskovitz knew or had reason to know that there was a substantial understatement for each of the years in issue. Although Mr. Moskovitz was married to petitioner during 2 of the 3 years in issue, we do not believe that he had any actual knowledge of these substantial understatements. Respondent argues that Mr. Moskovitz learned that there was a question regarding petitioner's handling of the Levy special account involving possible forgery charges when a summons was delivered to his home in March of 1976, well before the due date for filing of the 1975 tax return. We note, however, that the evidence indicates that Mr. Moskovitz signed the 1975 joint income tax return in January of 1976, at least 6 to 8 weeks prior to the time that the summons was delivered. In determining whether a spouse had reason to know of an understatement, this Court views as significant that spouse's degree of participation in business affairs or bookkeeping. Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975). *325 We believe Mr. Moskovitz's uncontradicted testimony that he did not handle the family finances, check books, or bank accounts and that there had been no disclosure to him of unreported additional income. We also believe Mr. Moskovitz's uncontradicted testimony that he turned over his salary checks to petitioner and received only a cash allowance from her. In addition, petitioner maintained possession of most of petitioners' credit cards. Furthermore, the bills that came in were given directly to petitioner and often Mr. Moskovitz would not even see them. Petitioner also made all bank deposits herself and reconciled all of the couple's bank statements. Another factor significant in determining whether a spouse had reason to know of the omissions in income is the existence of unusual or lavish expenditures during the years in issue. Mysse v. Commissioner,57 T.C. 680, 699 (1972). Although there were purchases made during the years in issue that were unusual in nature, Mr. Moskovitz explained how these purchases were arranged. For instance, petitioners purchased a home *326 in 1974 about 1 month before they were married. According to Mr. Moskovitz, petitioner's father lent them the money used to purchase the home and he holds the mortgage on it. In addition, petitioners went on a honeymoon in Acapulco for a week after they were married. The trip was paid for with funds from Mr. Moskovitz's personal savings. Finally, although Mr. Moskovitz admits that he purchased a new automobile in 1974, the car was paid for by trading in his own car and with long-term financing. Thus, we find that the purchases noted above, although admittedly out of the ordinary, were not financed with the funds embezzled by petitioner and therefore we do not find these purchases to be significant in deciding whether Mr. Moskovitz had reason to know of the omissions from gross income. It is obvious that Mr. Moskovitz totally relied on his wife to handle the family finances. Petitioner has accounting and bookkeeping experience and expertise, and was, in fact, presumed by Mr. Moskovitz to have properly completed the tax returns in question. The requirement of section 6013(e)(1)(C) that Mr. Moskovitz neither knew or had reason to know of the omission is therefore satisfied. *327 We must now ascertain whether "taking into account all the facts and circumstances, it is inequitable to hold * * * [Mr. Moskovitz] liable for the deficiency in tax." Section 6013(e)(1)(D). Although no longer a specific requirement of section 6013(e)(1), whether Mr. Moskovitz benefited from the substantial understatements of income is still a factor to be considered in making this determination. See H. Rept. 98-432 (Part 2) 1501, 1502 (March 5, 1984). [23]
We conclude, for the reasons that follow that it would be inequitable to impose liability upon Mr. Moskovitz. The term "inequitable" is defined under section 1.6013-5(b), Income Tax Regs., as follows: [24]
Whether it is inequitable to hold a person liable *328 for the deficiency in tax * * * is to be determined on the basis of all the facts and circumstances.In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. * * * [Emphasis added.] Respondent contends that Mr. Moskovitz received significant benefits from the income omitted from petitioners' 1974 and 1975 tas returns. We disagree. We are convinced from Mr. Moskovitz's uncontradicted testimony that he did not benefit in any significant manner from the money that petitioner embezzled from her employer during the years at issue. In addition, he did not receive any extraordinary gifts from his wife during this period. Furthermore, because petitioner had exclusive control over the family finances, *329 she was able to pay her creditors and otherwise make use of the ill-gotten funds in any way she chose. Indeed, we believe that the benefits, if any, received by Mr. Moskovitz as a result of the unreported income were in the nature of ordinary family support, which is not a sufficient basis to support a finding of significant benefit. Terzian v. Commissioner,72 T.C. 1164, 1172, 1173 (1979); Mysse v. Commissioner,57 T.C. 680, 698, 699 (1972).Furthermore, the recent amendments to section 6013(e) denote a liberalization of the innocent spouse provisions. See H. Rept. 98-432 (Part 2), supra at 1502. In light of these statutory changes, we do not believe that the incidental benefits enjoyed by Mr. Moskovitz are sufficient to make it equitable to impose liability in the instant case. We therefore conclude that petitioners have sustained their burden of proving Mr. Moskovitz entitled to the benefits afforded to an innocent spouse pursuant to section 6013(e). Section 6653(a) Addition to Tax
The next and final issue is whether petitioners' underpayment of tax for the 3 years in issue was due to negligence or intentional disregard of rules *330 and regulations pursuant to section 6653(a). Petitioner has the burden of proving that she is not liable for this addition to tax. Enoch v. Commissioner,57 T.C. 781, 802-803 (1972); O'Donohue v. Commissioner,33 T.C. 698 (1960). Petitioner, in the instant case, has failed to present any credible evidence to justify her failure to report these amounts as income on their returns or to rebut respondent's determination in the notice of deficiency. Petitioner argues on brief however, that she should not be liable for the section 6653(a) addition to tax due to her reliance upon her professional accountants who allegedly assisted petitioners in the preparation of their Federal income tax returns. We disagree. A taxpayer's reliance upon the advice of a tax return preparer cannot by itself absolve the taxpayer of responsibility for the correctness of his tax return. As a general rule, the duty of filing an accurate tax return cannot be averted by shifting the responsibility to an agent. Pritchett v. Commissioner,63 T.C. 149, 174 (1974). *331 Enoch v. Commissioner,supra at 802-803. An exception to this rule is made if the taxpayer is able to establish that he furnished all of the relevant information. Pritchett v. Commissioner,supra at 174. Enoch v. Commissioner,supra at 802-803. At the very least, petitioner must establish that she provided the tax return preparer with the information necessary to correctly prepare their return. Pessin v. Commissioner,59 T.C. 473, 489 (1972). Enoch v. Commissioner,supra at 802-803 (1972). Petitioners have made no such showing in the instant case. It is clear that petitioner embezzled substantial sums of money from her employer during each of the taxable years in issue. It is also well-established that embezzled funds are includable in gross income. James v. United States,366 U.S. 213 (1961). Petitioner produced no evidence to indicate that she furnished any information to her tax return preparer concerning her illegal activities and therefore we find in respondent's favor on this issue as to petitioner. [25]
*332 Decision will be entered under Rule 155.
APPENDIX I CHECKS DRAWN ON THE SPECIAL ACCOUNT PAYABLE TO THIRD PARTIES (i.e., checks paid to one of petitioners' creditors) Check No.
Year
Amount
Payee
1) 10707 1973
2,853.40
These checks were credited to
10771 (Total)
petitioner's account at Strawbridge
10871 & Clothier.
10935 10990 11074 11145 11214 11264 11326 11356 11446 2) 11507 1974
1,580.35
Same as above.
11584 (Total)
11652 11720 11815 11880 11935 12042 12142 12316 12386 3) 138   1975
864.44
Same as above.
432   (Total)
531   4) [26] 10989*
1973
852.15
These checks were credited to
11140*
(Total)
petitioner's charge account at
11190 Wanamaker's.
11262*
11321 11347 11433 5) 10504 1974
1,781.68
Same as above.
11581*
11651 11800*
11877 11936*
12025 12070 12141 12387 6) 147   1975
731.27
Same as above.
278   (Total)
523   7) 10766 1973
382.84
These checks were credited to
10998 (Total)
petitioner's Mastercharge account with
11084 the Provident National Bank.
8) 11577 1974
1,053.64
Same as above. Check No. 12397
11646 (Total)
($79.94) was credited to Mr.
11802 Moskovitz's Mastercharge acct.
11900 11989 12046 12103 12269 12397 9) 201   1975
248.06
This check was credited to Mr.
Moskovitz's Mastercharge account.
10) 10998 1973
178.86
These checks were credited to
11071 (Total)
petitioner's Bankamericard with the
11189 Philadelphia National Bank.
11349 11) 11583 1974
528.39
Same as above.
12027 (Total)
12065 12315 12) 212   1975
592.05
These checks were credited to Mr.
338   (Total
Moskovitz's Bank Americard account.
433   13) 11816 1974
135.52
These checks were credited to
148   1975
61.52
petitioner's charge account at Sears.
217   1975
31.79
14) 172   1975
74.19
These checks were credited to
399   1975
453.00
Mr. Moskovitz's charge account at Sears.
15) 11420 1973
122.78
This check was credited to
petitioner's charge account at the
Bamberger's department store.
16) 11641 1974
570.57
Same as above.
11820 (Total)
11901 11986 12104 17) 11817 1974
859.00
These checks were paid to petitioner's
11985 (Total)
landlord, Friedman and Raph.
12099 18) 11091 1973
186.14
These checks were credited to
11295 (Total)
petitioner's charge account at Bonwit
11344 Teller.
19) 11995 1974
93.00
Same as above.
20) 10853 1973
132.01
This check was to petitioner's account
11265 (Total)
at Gimbel's.
21) 11502 1974
20.00
Same as above.
22) 11001 1973
84.00
These checks were made payable
11199 (Total)
to Lintree Hosiery, a mail order
11284 company from which petitioner ordered
11425 hosiery for herself and other office
employees. She collected money to cover
the orders of the office employees
directly from those persons.
23) 514   1975
263.88
This check was credited to petitioner's
charge account at J. C. Penney's.
24) 10925 1973
309.30
This check was credited to petitioner's
charge account at Hess's Department Store.
25) 210   1975
155.80
Check number 210 was credited to Mr.
Moskovitz's Chevron charge account.
Petitioner testified that Mr. Levy let her
use his car while he was away once, and she
had to have it repaired while he was gone.
Check number 210, she said, was payment for
these repairs, authorized by Mr. Levy. Mr.
Levy has denied lending petitioner his car,
and she has failed to sustain her burden of
proof with respect to this check. No
reduction will be in the deficiency for the
1975 taxable year.
*333 APPENDIX II CHECKS PAYABLE TO THIRD PARTIES WITH STUBS THAT INDICATE A PAYEE OR AMOUNT DIFFERENT FROM THAT INDICATED ON THE CORRESPONDING CHECK 1) 11934
1974
$62.02
These checks were drawn on the special
11998
(Total)
account payable to Current, Inc. a mail
12116
order company. None of the corresponding
checkbook stubs indicate that Current, Inc.
was the payee.
2) 11993
1974
35.50
This check was drawn on the special account
payable to Frank Lewis Co., a mail order
company; the stub corresponding to this
check indicates a different payee.
3) 11006
1973
29.81
This check was made payable to The Country
Gourmet. The corresponding stub does not
match the check.
4) 11882
1974
37.73
Same as above.
11921
(Total)
5) 11286
1973
72.90
This check was payable to Figi's a mail
order company. The corresponding stub was
not properly completed.
6) 223  1975
19.85
Same as above.
7) 11290
1973
14.21
This check was payable to Miles Kimball, a
mail order company. The corresponding
stub does not indicate the same payee.
8) 12044
1974
23.65
Same as above.
9) 502  1975
67.59
Same as above.
509  (Total)
10) 12112
1974
43.60
These checks were payable to Joan Cook, a
135  (Total)
mail order company.The corresponding
stubs do not match.
11) 425  1975
54.20
This check was payable to Joan Cook. The
corresponding stub does not indicate any
payee at all.
12) 11320
1973
207.15
These checks were payable to the Kenton
11335
(Total)
Collection. Both of the corresponding
check stubs indicate payees other than
those shown on the checks in issue.
13) 11282
1973
31.19
This check was payable to "Rich's." The
corresponding stub indicates a different
payee.
14) 12060
1974
26.03
This check was payable to J. C. Penney's.
The corresponding stub indicates a
different payee.
15) 12041
1974
135.25
This check was payable to Saks Fifth
Avenue. The corresponding stub indicates a
different payee.
16) 11212
1973
29.50
This check was payable to "Hattie
Carnegie." The corresponding checkbook
stub indicates a payee other than "Hattie
Carnegie."
17) 11498
1974
60.00
This check was payable to "St. Hubert's
Alumni." There is a different payee
indicated on the corresponding checkbook
stub.
18) 11992
1974
10.00
This check was payable to "Fosdick Corp."
The corresponding stub indicates a
different payee.
19) 12113
1974
17.89
This check was payable to "Harriet Carter."
A different payee is indicated on the
corresponding checkbook stub.
20) 11499
1974
56.20
This check was payable to "Barbara
Corbin." The corresponding stub for this
check does not indicate a payee.
21) 283  1975
31.15
This check was payable to "Jean Coren."
The corresponding stub indicates a
different payee.
22) 12146
1974
28.10
This check was payable to "Pepperidge
Farm." The stub corresponding to this
check does not indicate any payee.
*334 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, during the years in issue.↩
2. Exhibits 10-J, 11-K, and 12-L contain copies of the 257 checks upon which respondent based his deficiency determination for the 3 years in issue. We note that the total of the amounts shown on these checks ($21,582.49 for 1973; $23,352.55 for 1974; and $20,289.23 for 1975) differ slightly from the total understatements alleged by respondent as noted above. We leave the parties to make any appropriate adjustments as part of their Rule 155 computations.↩
3. Check number 183, for $51.08, was drawn by petitioner on the special account payable to Wanamaker's. This check forms part of the basis for the 1975 deficiency, but was not credited to petitioner's charge account at that store.↩
4. We note that in November of 1973, petitioner bought a coat at Bonwit Teller for $84 which was charged to her account at that store. In December of 1973, a check for $84, number 11431, was drawn on the special account payable to Bonwit Teller. The corresponding checkbook stub was properly completed by petitioner.↩
5. A letter from Gerity Products concerning these checks was to be made a part of the record in this case; it was designated exhibit 41-AO in the parties' second stipulation of fact. The Court did not receive this letter, and the parties have not been able to supply a copy. The parties have agreed informally that the letter is not necessary to a disposition of any particular issue concerning Gerity Products. ↩
6. Mr. Levy was reimbursed for the amount of check number 11219 by a company for which he worked.↩
7. Respondent has conceded that check number 10921 represents a payment made for the benefit of Mr. Levy.↩
8. Each explanation includes a description of why a particular check was brought into question. The dates and locations refer to Mr. Levy's whereabouts for the date on which the check was cashed. A reference such as "Stub-Francis S. McKelvey" refers to the fact that the stub contained a notation that the check was payable to Francis S. McKelvey. In addition, a reference such as "cashed check #10736, $1,000, on January 18, 1973" refers to the fact that Mr. Levy received cash from check number 10736 in the amount of $1,000 on January 18, 1973.↩
9. All references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
10. See also Schildhaus v. Commissioner,T.C. Memo. 1969-283, affd. per curiam 442 F.2d 1343 (2d Cir. 1971) (petitioners sustained their burden of proving that certain moneys found in decedent's safe deposit box were acquired in a year other than that determined by respondent), and Estate of Nasdeo v. Commissioner,T.C. Memo. 1968-60↩ (petitioners sustained their burden of proof by showing that a portion of certain unexplained disbursements were not taxable income).
11. Petitioners argue, on brief, that they were denied access to the materials and documents which would enable them to meet the allegations of respondent. We dismiss petitioners' assertion because it is unsupported and without merit. We also note that the Tax Court Rules of Practice and Procedure offer both parties ample opportunity to seek redress for any abuses that might occur during the discovery process. See Rule 104.↩
12. Janet Szlachta compared the checks written to third parties against invoices contained in Mr. Levy's files to determine to whose accounts the payments had been credited. She wrote to all the stores at which Mr. Levy had an account to determine if canceled checks payable to those stores had been applied to Mr. Levy's account. Janet also wrote to all the stores to which canceled checks drawn on the special account had been sent and where Mr. Levy did not maintain an account. She contacted third party payees of the questionable checks from the special account in order to determine to whose accounts the payments were credited. Based on the responses received from third party payees, it was determined that certain checks drawn on Mr. Levy's special account had been credited to petitioner's own personal accounts.↩
13. As noted above, the books maintained by petitioner were regularly reviewed by an accountant employed by the company for which Mr. Levy worked. There were never any irregularities discovered in the books thus reviewed, but the accountant did not review the special account.↩
14. Mrs. Levy and the Levy children were not called to testify in this case, but it was agreed, at the time of trial, that if they had been called, they would have testified as follows with respect to items petitioner claims to have purchased for them: That they may have received some of these items; that they have no recollection of receiving other items but might have; that if they did receive any of these items, they were not able to remember specifics as to when the items were received, nor can they remember who may have purchased any specific item on any specific occasion. As to the Levy children, they do not remember whether or not they ever went shopping with petitioner, and if they did, they would not be able to remember whether anything was purchased.↩
15. Mr. Levy was subsequently reimbursed in the amount of $46.92 by a company for which he worked.↩
16. We note that petitioner pled guilty to four counts of forgery in a Pennsylvania court with regard to four checks totaling $5,000.Check number 513, discussed above, was one of these four checks.↩
17. Section 6501(e)(1)(A) provides as follows: (e) Substantial Omission of Items. -- Except as otherwise provided in subsection (c) -- (1) Income Taxes. -- In the case of any tax imposed by subtitle A -- (A) General Rule. -- If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph -- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.↩
18. This amount excludes check number 11875 in the amount of $700 as that check was removed from the understatement. ↩
19. Under sec. 6501(b)(1)↩, a return filed before the last day prescribed for filing is considered as filed on such last day. Thus, petitioner's timely filed 1973 return is deemed filed on April 15, 1974 and petitioners' timely filed 1974 and 1975 returns are deemed filed on April 15, 1975 and April 15, 1976, respectively.
20. We note that there is a dispute between the parties as to whether the Forms 872 for 1975 were conditioned upon the applicability of the 6-year statute of limitations. Because respondent has proven the applicability of sec. 6501(e)(1), the period of assessment for 1975 continued through April 15, 1982, well after the date on which respondent mailed the statutory notice of deficiency for that year. Thus, whether the Forms 872 were conditioned on the applicability of the 6-year statute is of no import. In addition, following the trial of this case, respondent filed an answer to Petitioners' Amended Petition addressing the issue of the applicability of the 6-year statute of limitations for 1975.Petitioners argue that because this issue was raised at trial it is a "new matter" upon which respondent has the burden of proof under Rule 142(a). We disagree. Petitioners raised the statute of limitations for 1975 for the first time in their "Motion for Leave to Amend Petition" served on respondent on June 6, 1983. Respondent's answer to Petitioners' Amended Petition merely replied to this affirmative allegation by setting forth the assertion that the notice of deficiency was timely under sec. 6501(c)(4). This does not constitute a "new matter" for purposes of Rule 142(a). Moreover, respondent bears the burden of proving the requisite omission when relying on the sec. 6501(e)↩ 6-year statute of limitations.
21. Sec. 6013(e), as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801, provides, in pertinent part, as follows: (e) Spouse Relieved of Liability in Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. (2) Grossly erroneous items. -- For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse -- (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law. (3) Substantial understatement. -- For purposes of this subsection, the term "substantial understatement" means any understatement (as defined in section 6661(b)(2)(A) which exceeds $500. * * * [The amendments in sec. 6013(e)↩ made by the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494 were made applicable to all cases pending at the time of their enactment.]
22. A "substantial understatement" is defined in sec. 6013(e)(3) as any "understatement" which exceeds $500. Sec. 6661(b)(2)(A)↩ defines an "understatement" as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed which is shown on the return, reduced by any rebate.
23. Prior to its 1984 amendment, sec. 6013(e)(1)(C)↩ specifically required that we make our determination as to whether it is inequitable to hold the "innocent spouse" liable for the deficiency by "taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income * * *."
24. We note that sec. 1.6013-5(b), Income Tax Regs.↩, was promulgated prior to the effective date of sec. 424(a) of the Tax Reform Act of 1984, Pub. L. 98-369, which removed the specific reference to a significant benefits determination.
25. See Trimmer v. Commissioner,T.C. Memo. 1983-131; Ross v. Commissioner,T.C. Memo. 1978-380↩.
26. Those checks designated by an asterisk (*) are checks a portion of the proceeds of which were used to purchase items for Mr. Levy or his family. Such amounts were removed from the understatement for the year involved.↩